# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

In the Matter of Mark Andrew Peper, Respondent

Appellate Case No. 2014-001414

---

Opinion No. 27441
Heard August 5, 2014 – Filed September 3, 2014

---

## PUBLIC REPRIMAND

---

Lesley M. Coggiola, Disciplinary Counsel, and Barbara
M. Seymour, Deputy Disciplinary Counsel, both of
Columbia, for Office of Disciplinary Counsel.

Michael J. Anzelmo, of Nelson Mullins Riley &
Scarborough, LLP, of Columbia, for respondent.

---

**PER CURIAM:**   In this attorney disciplinary matter, respondent and the Office
of Disciplinary Counsel have entered into an Agreement for Discipline by Consent
(Agreement) pursuant to Rule 21 of the Rules for Lawyer Disciplinary
Enforcement (RLDE) contained in Rule 413 of the South Carolina Appellate Court
Rules (SCACR).  In the Agreement, respondent admits misconduct and consents to
the imposition of a public reprimand with conditions.  We accept the Agreement
and issue a public reprimand with conditions as stated hereafter.  The facts, as set
forth in the Agreement, are as follows.

## Facts

### Matter I

Client A, respondent's childhood friend, was the sole beneficiary of a trust established by Client A's mother prior to her death. The corpus of the trust included stocks and a parcel of land with a house where Client A and his wife resided. In January 2006, Client A approached respondent with a request that respondent take over as trustee of the trust. Respondent agreed and prepared a consent substitution of trust and a proposed Order Naming Successor Trustee.

Respondent acknowledges that his services as trustee for Client A's trust were law-related services and, therefore, the Rules of Professional Conduct apply pursuant to Rule 5.7. Further, respondent admits that at all times relevant to this matter, Client A believed respondent was acting as his attorney and, in fact, frequently referred to respondent as his attorney in conversations with respondent and others. As a result, respondent acknowledges that it was reasonable for Client A to believe that the trustee services respondent was providing carried with it the protections normally afforded as part of the attorney-client relationship and that respondent took no steps to advise him otherwise.

### Misrepresentation to the Court

In the proposed Order Naming Successor Trustee, respondent significantly overstated his qualifications to serve as trustee. He stated that he was "an attorney licensed to practice law in the state of South Carolina and [that he had] an extensive background in the Probate field, including but not limited to, trust administration." In fact, as of the date of submission of the proposed order to the Probate Court, respondent had only been admitted to the Bar for three months. Although he had worked for a probate judge and a law firm as a law clerk for a total of one and one-half years, he had never actually handled a probate matter as an attorney and had no experience as a trustee or administrator of an estate. The probate judge signed the order naming respondent as successor trustee on February 28, 2006.

Respondent admits that he misrepresented his experience to the probate judge when he submitted the proposed Order Naming Successor Trustee. He further

acknowledges that he did not have sufficient experience to serve as Client A's trustee.

## Financial Recordkeeping

The stocks held by the trust were managed by the investment division of a bank. The original trustee had set up a trust account at that bank to disburse funds as necessary for the benefit of Client A. At the time respondent was appointed successor trustee, the stock value was approximately $52,000.00. When funds were requested by Client A, respondent would contact a representative at the bank who would sell off some stock and place the proceeds of the sale into the trust account. Once respondent was advised that the funds were in the trust account, he would write a check. The check was given to Client A or used to pay funds on his behalf. The stocks were depleted between April 2006 and November 2007.

On March 17, 2009, respondent filed a petition to dissolve the trust. Respondent submitted an accounting of the disbursement of the funds generated by the sales of the stocks. On April 9, 2009, the probate judge signed respondent's proposed order dissolving the trust. Respondent did not retain copies of the invoices or bills he paid; he did not prepare receipts; he did not keep records of cash disbursed; and he did not retain reconciliations of the trust account.

During the time that respondent served as trustee, he personally provided financial assistance to Client A and his wife. This assistance was in the form of cash and checks to them or to third party creditors. Respondent estimates that the total assistance he personally provided was approximately $50,000.00; however, he maintained no records of these payments. In response to the disciplinary complaint, respondent reviewed his bank records and accounted for approximately $22,838.00 in payments to or on behalf of Client A and his wife.

There is no indication that any trust funds were misappropriated or mishandled. However, respondent does admit that he failed to comply with Rule 417, SCACR, which required that he maintain a receipt and disbursement journal, a beneficiary ledger, records of disbursement, check stubs, bank statements, records of deposit, the equivalent of pre-numbered canceled checks, and other documents reasonably

necessary for a complete understanding of the financial transactions for a period of six years.[1]

<u>Transfer and Encumbrance of Real Property</u>

The February 28, 2006, Order Naming Successor Trustee stated that the original trustee and respondent agreed that the real property held in trust was "to remain in the Trust and shall not be transferred out of the Trust under any circumstances." Contrary to that agreement and the order, respondent prepared a deed transferring the ownership of land and house from the Trust to Client A. Respondent also prepared a deed transferring ownership of the property from Client A to himself. He recorded the two deeds on May 29, 2008.

Respondent initially attempted to record an affidavit of consideration with the deed that stated that the property was exempt from the recording fee. When it was rejected by the clerk, he amended the affidavit to state that the consideration paid for the property was $50,000.00. Respondent did not actually pay Client A any money in connection with the transfer of title to the property. Respondent listed this amount on the affidavit of consideration based on his estimation of the total financial assistance he had personally provided to Client A and his wife, although at the time the assistance was provided, neither respondent nor Client A considered it a loan or that Client A would be obligated to repay it. At no time did respondent obtain an appraisal of the property to determine a fair price.

Respondent asserts that he and Client A agreed that Client A and his wife would have the right to remain living on the property rent free for the remainder of Client A's lifetime, with respondent paying all utilities, taxes, insurance, and other property-related expenses. However, there is no reference to a life estate or any other retention of interest by Client A or his wife in the deed prepared and filed by respondent. In fact, other than Client A's signature on the deed, there is no evidence of any writing provided to or signed by Client A regarding the terms of the transfer of the property to respondent.

---

[1] The version of Rule 417, SCACR, that governed respondent's conduct in connection with the trust required that he maintain certain financial records related to all "bank accounts which concern or affect the lawyer's practice of law." The current version of Rule 417 is limited to "client trust accounts."

Respondent did not seek or obtain approval from the Probate Court of the May 2008 transfers of the title to the property. In fact, when he filed his petition to resolve the Trust with the Probate Court in March 2009, he stated only that he "deeded the property to the beneficiary of the Trust." He did not disclose to the probate judge that he had simultaneously deeded the property to himself.

On July 30, 2008, respondent encumbered the property by borrowing $112,000.00 and signing a mortgage on the property for $224,000.00.[2] Respondent placed an insurance value on the property in the amount of $202,070.00. Respondent is unable to produce the property tax bills for 2008 or 2009, but the 2010 bill reflects an appraisal value for tax purposes of $285,000.00. Respondent used a portion of the proceeds of the loan to pay off personal debt and for personal expenses. Respondent represents that he used some of the proceeds to provide financial assistance to Client A and his wife and to pay expenses related to the property, but he has no record or accounting to support his assertions in this regard.

On September 17, 2009, respondent signed a second mortgage encumbering the property to secure a note for a $32,200.00 loan respondent received from a personal friend. Respondent represents that this was an error on the part of a staff person who drafted the mortgage, as it was his intention to mortgage his personal home, not the property obtained from Client A. Respondent states that he did not realize he had encumbered the wrong property until the disciplinary complaint was filed in March 2010. During the course of the disciplinary investigation, respondent satisfied both mortgages and transferred the property back to Client A by quitclaim deed.

Respondent acknowledges that the transfer of the property to himself was contrary to the order of the Probate Court. He further admits that the transfer and encumbrance of the property was a conflict of interest. Although Client A did have separate counsel to advise him regarding the transaction, respondent admits that the terms of the transfer were not fair and reasonable to Client A, that the terms of the transactions were not relayed to Client A in writing, and that he did not obtain Client A's informed consent. Respondent further admits that he should

---

[2] The bank's explanation to respondent for the difference between the note (which references the amount actually borrowed) and the amount on the mortgage was "in case you later are able to increase the note amount you do not have to record a new mortgage," essentially provided an equity line of credit to respondent.

have disclosed to the Probate Court that he had arranged for the transfer of the property to himself.[3]

## Matter II

Client B and Client C (Sisters) hired respondent for the administration of their mother's estate after her death on October 22, 2005. While the probate matter was pending, Sisters discussed with respondent the possibility of filing a civil action for malpractice against the medical facility where their mother was treated prior to her death. On August 15, 2006, Sisters signed a contingency fee agreement retaining respondent to "prosecute all claims arising out of the personal injury suffered by [their mother]." The fee agreement provided specific provisions for the "filing of a lawsuit." The only limitation on the scope of respondent's representation was that "[i]n the event an appeal is taken," the parties agreed they would enter into "a separate legal services agreement."

On May 16, 2007, respondent submitted a settlement demand to the facility's insurance carrier. The carrier responded with an offer well below the demand amount; the Sisters rejected the offer. Respondent continued settlement negotiations. On April 7, 2008, the insurance carrier sent a letter to respondent rejecting Sisters' latest counteroffer and terminating settlement negotiations due to impasse.

## Change to the Scope of Representation

At the time respondent had accepted the case, he had no experience in personal injury cases, malpractice cases, or civil litigation. Although he studied and consulted with experienced attorneys in preparation for the case, he determined during settlement negotiations that he lacked the experience and competence to handle the matter. Respondent recalls that he met with Sisters personally after receipt of the first offer, explained to them that he was not the best person to represent them, and told them that he would not have any idea how to handle litigation. Respondent recalls that Sisters agreed to change the scope of the representation at that meeting and limit respondent's work to attempting to obtain a satisfactory settlement, but that he would not file suit if negotiations were

---

[3] Respondent's conduct in Matter I is subject to the version of the Rules of Professional Conduct in effect in 2006.

unsuccessful. Respondent has no documentation of this conversation and no written confirmation of changing the scope of the representation.

Sisters do not recall a conversation during settlement negotiations in which they agreed to change the terms of the representation. Their understanding was that, if respondent was unable to settle the matter, he would file a lawsuit for them. According to their recollection, it was not until after the insurance company terminated negotiations that respondent decided to associate another attorney to assist with the litigation. This would have been in accordance with the terms of the signed fee agreement which stated that "associate counsel may be employed at the discretion and expense of [respondent]." It was never their understanding that respondent's representation ended with the settlement negotiations.

Respondent acknowledges that the change in the scope of his representation to specifically exclude litigation required Sisters' informed consent. Respondent further acknowledges that his failure to obtain that informed consent in writing resulted in a misunderstanding between himself and Sisters regarding his role in the matter.

## Association of Counsel for Litigation

In any event, it is undisputed that when settlement negotiations reached an impasse, respondent referred the matter to a more experienced attorney (Attorney) in his building. Sisters met with respondent and Attorney to discuss the case and Attorney's potential involvement. Following the meeting, Attorney accepted the case, understanding that she was being associated to assist respondent in the matter, respondent would remain involved in the matter, and that she and respondent would divide the fee. This was Sisters' understanding as well based on a confirmation letter they received from Attorney on July 25, 2008, which confirmed that they had "agreed to allow [Attorney's] association to assist in the handing of [their] mother's case." The letter specifically referred to Attorney's "association" twice more. The letter also confirmed that Sisters' contingency fee agreement would not change and that Attorney and respondent had agreed to divide the legal fee. Attorney sent respondent a copy of the July 25, 2008, letter along with a letter she sent on that same day to the insurance company advising it of her "association" on the matter.

## Missed Statute of Limitations

On October 7, 2008, Attorney obtained a slightly higher settlement offer from the insurance company, but the case was not settled. The statute of limitations on the personal injury claim expired on October 22, 2008. Neither respondent nor Attorney filed a civil action in the personal injury matter. Sisters state that neither respondent nor Attorney advised them of the statute of limitations date or that it had been missed. Respondent asserts that he advised Sisters of the statute of limitations date when he referred them to Attorney, but admits he never advised them in writing. He further asserts that he had no responsibility for ensuring that suit was filed prior to the expiration of the statute of limitations. He learned of the missed statute of limitations in a meeting with Sisters on an unrelated matter in May of 2010.

Respondent now represents that it was his understanding that Sisters "formally terminated" his representation in July 2008 and that he had no further obligations in the matter after Attorney became involved. In spite of notice of Attorney's understanding that it was an association rather than a substitution of counsel, respondent made no effort to clarify the situation at the time. He did not respond to receipt of copies of Attorney's July 25, 2008, letters, he did not send a termination letter to Sisters, and he did not contact Attorney or Sisters to discuss the misunderstanding. In fact, respondent had no communication with Attorney or Sisters until the May 2010 meeting when he met with Sisters on an unrelated matter and inquired about the status of the personal injury case.

When respondent learned Attorney had missed the statute of limitations, he contacted the insurance company to determine if there was a possibility of payment of the last settlement offer. The insurance company declined. Respondent then referred Sisters to independent counsel regarding their potential legal malpractice claim. Sisters hired counsel and sued Attorney for malpractice. Attorney filed a cross claim naming respondent as a third-party defendant. Neither Attorney nor respondent had malpractice insurance coverage at the time. The civil claims were ultimately dismissed without prejudice and with no compensation to Sisters.

Respondent acknowledges that he did not act diligently in pursing the matter between August 2006 and July 2008 because of his insecurity about his abilities with regard to personal injury litigation. He further acknowledges that his lack of

diligence contributed to the association of Attorney a mere three months before the expiration of the statute of limitations. He also admits that it was incumbent upon him to ensure that both Sisters and Attorney were aware of the statute of limitations date.[4]

## Law

Respondent admits that by his conduct he has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (competence), Rule 1.3(diligence), Rule 1.4 (communication), Rule 1.8(a) (requirements for lawyer to knowingly acquire ownership, possessory, security or other pecuniary interest adverse to client), Rule 1.15(a) (safekeeping client property), Rule 1.16(d) (requirements upon termination of representation), Rule 3.3(a)(1) (candor to tribunal), and Rule 5.7 (responsibilities regarding law related services). In addition, respondent admits he violated the recordkeeping provisions of Rule 417, SCACR, which were in effect at the time he served as trustee of Client A's Trust.

Respondent also admits he has violated the following Rules for Lawyer Disciplinary Enforcement, Rule 413, SCACR: Rule 7(a)(1) (it shall be ground for discipline for lawyer to violate Rules of Professional Conduct or other rules of this jurisdiction regarding professional conduct of lawyers).

## Conclusion

We find respondent's misconduct warrants a public reprimand with conditions. Accordingly, we accept the Agreement and publicly reprimand respondent for his misconduct. Further, as set forth in the Agreement, respondent shall pay the costs incurred by ODC and the Commission on Lawyer Conduct (the Commission) in the investigation and prosecution of this matter within thirty (30) days of the date of this opinion. In addition, respondent shall complete the Legal Ethics Practice Program Ethics School, Trust Account School, and Law Office Management School within nine (9) months of the date of this opinion and shall provide documentation of completion to the Commission no later than ten (10) days after the conclusion of the programs.

---

[4] Respondent's conduct in Matter II is subject to the version of the Rules of Professional Conduct in effect in 2008.

**PUBLIC REPRIMAND.**

**TOAL, C.J., PLEICONES, BEATTY, KITTREDGE and HEARN, JJ., concur.**